1

2

3          **UNITED STATES DISTRICT COURT**

4          **NORTHERN DISTRICT OF CALIFORNIA**

5          **SAN JOSE DIVISION**

6

7    ANTHONY SIMS,                                    Case No. 22-cv-0814-BLF

              Plaintiff,
8                                                      **ORDER DENYING PETITION FOR**
         v.                                            **WRIT OF HABEAS CORPUS**
9
     THERESA CISNEROS, Warden,                         [Re: ECF 1]
10
              Defendant.
11

12        A jury convicted Petitioner Anthony Sims of second-degree murder. *See* ECF 1

13   ("Petition") at 2 (stating Sims was found guilty of violating Cal. Penal Code § 187). Sims was

14   sentenced to a total term of fifteen years to life in prison. Pet. at 1.

15        Sims subsequently, and unsuccessfully, pursued direct review in California state court. Pet.

16   at 2-3; Resp. at 2. On appeal, Sims argued his trial was plagued by prosecutorial misconduct and

17   ineffective assistance of counsel. ECF 13-11, Ex. 3 ("Opening Brief on Appeal"). On July 7, 2020,

18   the California Court of Appeal affirmed the judgment in a reasoned opinion. ECF 13-11, Ex. 6

19   ("Court of Appeal Opinion"). The California Supreme Court summarily denied Sims's petition for

20   review. ECF 10, Ex. 8.

21        This matter now comes before the Court on a petition for writ of habeas corpus pursuant to

22   28 U.S.C. § 2254(d). Respondent answered the Petition. *See* ECF 12 ("Response"). Though given

23   notice and an opportunity to do so, Mr. Sims did not file a traverse.

24        Having considered the parties' submissions, the record in the case, and the applicable law,

25   the Court DENIES the petition.

United States District Court
Northern District of California

**I.    BACKGROUND**

The following facts, presumed to be correct under 28 U.S.C. § 2254(e), are excerpted from

the California Court of Appeal's decision on direct appeal. *See Brown v. Horell*, 644 F.3d 969,

972 (9th Cir. 2011):

> Factual and Procedural Background
>
> Sims was tried with three other participants in the gun battle. We affirmed the convictions of two of his co-defendants, Alex Davis and Michael Stills, Jr., in a previous opinion. (*People v. Davis* (Mar. 27, 2019, A152259 & A153136) (*Davis*) [nonpub. opn.].) Our recitation of the facts in the following subheadings A through I is quoted from that opinion. As set forth in more detail below, the evidence tended to suggest that Sims shot at the third co-defendant, Jerry Harbin; was shot in the chest himself; and escaped from the scene as Davis, who fired the shot that killed Pierce, shot toward him and another participant, Julian Ambrose.
>
> "*A. Third World and the Bottoms.*
> "In March 2015, Pierce was killed near the intersection of 30th Street and Chestnut Street in West Oakland. The area is nicknamed 'Third World' after a rapper from there. Of the people charged with crimes in connection with Pierce's murder, several were associated with Third World: Shelton McDaniels, who hung out in a house at that intersection; Davis, who was friends with McDaniels and also hung out at the house; Jerry Harbin, who shared a half brother with McDaniels and also hung out in Third World, although he was not from that neighborhood; and Stills, who grew up around Third World and often hung out in that area as well.
>
> "The other people charged were associated with another neighborhood of West Oakland known as 'the Bottoms': Joneria Reed; her son, Dijon Ward; a cousin of hers, ... Sims, who was actually from East Oakland; and ... Ambrose, who was friends with Ward.
>
> "Despite the prosecution's attempts to paint the shootout as a battle between warring groups, little evidence suggested there was any tension between the two neighborhoods at the time of the murder. To the contrary, several witnesses testified that the conflict that day grew out of personal disagreements. Indeed, as discussed further below, the evidence showed a complex web of friendships and other connections between the two groups. [FN 1]
>
> > [FN 1:  Sims, Harbin, Davis, and Stills were tried together in this case. After the jury indicated it was deadlocked on the murder charge against Harbin, he pleaded no contest to voluntary manslaughter, and he was sentenced to 13 years in prison in July 2017. Davis and Stills were convicted of second degree murder and various firearm enhancements, and later that year they were sentenced, respectively, to 40 years in life in prison and 16 years to life in prison.

United States District Court
Northern District of California

(*Davis*, *supra*, A152259 & A153136.) Sims, who was 19 years old at the time of the murder, was not sentenced until July 2018, to allow for time to make a record for a future youth offender parole hearing under *People v. Franklin* (2016) 63 Cal.4th 261.

The cases against McDaniels and Ambrose were still pending at the time of Sims's sentencing. "Ward pleaded no contest to being an accessory after the fact and received probation. Finally, Reed testified for the prosecution in this case under an agreement that if she was truthful, she would be allowed to withdraw her plea to murder and receive a six-year sentence for voluntary manslaughter." (*Davis*, *supra*, A152259 & A153136.)]

"*B. Harbin and His Girlfriend Go to Third World.*
"On March 9, 2015, Harbin, who was the only one of the four defendants to testify, bought a used red Porsche Cayenne SUV. Around 3:30 p.m., he picked it up from the seller at 30th Street and Broadway in Oakland. He left the car he had driven there, a rental gray Buick Regal, and drove the Porsche to 28th Street to pick up his girlfriend.

"After getting his girlfriend, Harbin called McDaniels, whom he considered a brother. McDaniels was at a nearby liquor store, and Harbin headed there to show him the Porsche. While his girlfriend stayed in the car, Harbin got out and spoke to McDaniels, who was with Davis, a friend nicknamed Goofy, and another friend Harbin did not know. McDaniels told Harbin that there was a group of 'maybe 15 to 20 women' in the Third World area who were 'trying to basically hang out and have a good time' with McDaniels and his friends. McDaniels invited Harbin to come, and Harbin responded that he would meet McDaniels there after taking his girlfriend to pick up the Buick.

"Meanwhile, Harbin's girlfriend spoke on the phone to one of her close friends. Based on the conversation, Harbin's girlfriend believed that her friend was going to get in a fight with Ward's girlfriend and that another friend, R.B., might also become involved. R.B. had dated Donald Ward, Ward's brother and Reed's son, until his murder a few months earlier. R.B. was in the beginning stages of a relationship with McDaniels, whom she continued to date after he went to jail for Pierce's murder.

"When Harbin returned to the Porsche and told his girlfriend they were going to get the Buick, she asked him if he could first take her to find R.B. Harbin had seen R.B. around 30th and Chestnut, where she lived, earlier that day, so he drove to that area. He testified that when he and his girlfriend arrived, there were 'a lot of women in the middle of the street,' including his younger cousin, who was best friends with R.B. The women were 'in an uproar,' and he 'could tell something was going on.' His girlfriend spotted R.B. and asked her to leave with them, but R.B. refused.

*"C. The Fight Between Harbin's Girlfriend and Ward's Girlfriend.*

"Reed and her sister had driven to Third World earlier that afternoon to visit a friend. Ward's girlfriend, the mother of his child, subsequently arrived at 30th and Chestnut to get Reed's EBT card to buy groceries. Two of Ward's girlfriend's female cousins accompanied her. At the time they arrived, Davis, Stills, and McDaniels were in the area.

"Before Harbin and his girlfriend could leave after making contact with R.B., Ward's girlfriend approached the passenger's-side window of the Porsche and asked Harbin's girlfriend what she was looking at. Harbin's girlfriend responded, '"I'm grown. I can look wherever I want,"' and they exchanged more words. Harbin's girlfriend testified that Ward's girlfriend did not like her because she had had a fling with Ward the previous year, but Ward's girlfriend denied ever 'hav[ing] issues over [Ward]' with the other woman.

"Harbin tried to drive away, but his girlfriend, whom he described as having an 'explosive' temper, jumped out of the Porsche while it was moving. She 'beeline[d] straight towards [Ward's girlfriend],' punched her, and grabbed her hair. Harbin's girlfriend was bigger than Ward's girlfriend, and witnesses agreed that Harbin's girlfriend was winning the fight.

"Several other women then joined the fight to help Ward's girlfriend. Among them were Reed's sister, both of Ward's girlfriend's cousins, and Harbin's cousin. R.B. saw Ward's girlfriend's younger cousin hit Harbin's girlfriend and intervened in an attempt to stop the fight, but she soon gave up in the chaos.

"Meanwhile, Harbin got out of the Porsche and also tried to stop the fight. He saw his cousin punching his girlfriend, who was pregnant but not yet showing, and said, '"You know she pregnant. You wrong. What are y'all doing?"' Several of the women were pulling his girlfriend's hair, and he tried to remove their hands from her head and pull her away from Ward's girlfriend.

"According to Ward's girlfriend, Harbin 'pushed people off of [his girlfriend], got violent with the girls,' including hitting Ward's girlfriend's younger cousin. Ward's girlfriend's cousins agreed with this characterization, although the younger one allowed that Harbin was originally trying to break up the fight. Reed testified that as she was trying to stop the fight, Harbin 'shove[d]' her to the ground. Harbin admitted that he pushed Reed as he was 'breaking everyone up' but denied it was intentional.

"Reed testified that she expected one of the men present from the Third World group would help her up, 'since they were cool with [her deceased] son,' and she became angry when no one did. A neighbor w' "ho lived near 30th and Chestnut testified that she 'noticed a commotion' and then heard a female voice say, '"You Third World niggas are some punk ass niggas,"' and refer to a woman's being pushed to the ground.

"Reed stated that after being pushed to the ground, she said to Harbin, '"Why the fuck you put your hands on me?"' She testified,

'I remember someone saying, "That's Donald mom." And the next thing I heard was [Harbin say], "Fuck you and your dead son."' Ward's girlfriend and her cousins testified that they also heard this response. Harbin, however, denied saying anything to Reed about her son: '[S]he's saying that somebody said, "That's Donald's mom," that would mean as much to me as if somebody were to tell me you're Andrew's dad or you['re] Michael's mom. I don't know who Donald is. I don't know this lady at all. [¶] That was pure embellishment. That's something that she created after Ms. Pierce [died].' R.B. did not hear anyone say anything bad about her deceased boyfriend either.

"*D. Harbin and His Girlfriend Leave.*
"After Reed fell, Harbin and his girlfriend got back into the Porsche. Harbin's girlfriend testified that she wanted to leave because she did not 'want to put [Harbin's] life in jeopardy over a girl fight.' Before they could drive away, Ward's girlfriend approached the passenger's-side window and tried to pepper spray Harbin's girlfriend, but nothing came out.

"According to Ward's girlfriend, Harbin then 'flashed' a handgun at her, at which point she backed away from the car. Her cousins also both testified that Harbin showed a gun. Harbin, a convicted felon, admitted that he was carrying a semiautomatic 1911 .45-caliber handgun at the time, but he denied showing it to Ward's girlfriend. When asked why he had a gun that day, he explained, 'It's Oakland. It's like NASCAR. You're gonna wear seatbelts. You're not looking to get into a crash, but it happens.'

"Harbin, who was upset with his girlfriend for fighting, dropped her back off on 28th, which was about six blocks away. He then drove the Porsche to his uncle's house on nearby Mead Street, left it parked there, and got a ride to 30th and Broadway so he could retrieve his Buick.

"Harbin testified that as he was driving the Buick, McDaniels called him and told him 'to come back [to 30th and Chestnut] basically and straighten all of this out.' Harbin explained that he did not drive the Porsche back to the area because he was already in the Buick, the Porsche had an alignment problem, and he 'was on probation and ... didn't want to get pulled over in this car because [his girlfriend] had a fight in this car.' He testified that heading back to Third World, he thought he 'had got rid of the problem and ... [was] coming back to fix whatever had happened.' He elaborated, 'It's a fight between two 19-year-old girls. Like, I'm not expecting anybody to be hurt behind it.'

"*E. Reed Calls Ward and Sims to the Scene.*
"Harbin's girlfriend testified that before leaving 30th and Chestnut with Harbin, she heard Ward's girlfriend say, referring to Ward, '"Call my baby daddy."' According to Harbin's girlfriend, Reed then grabbed the phone and talked to her son. Harbin's girlfriend and R.B. both heard Reed say something like, '"This nigga put his hands on me."'

"Reed admitted that she called Ward and told him that someone had put hands on her, as well as that his girlfriend had been beaten up. Reed also admitted that Ward already knew she was in Third World and that she expected him to show up, even though she denied actually asking him to do so. Believing Ward might arrive, Reed also called Sims because she did 'not want[ ] [her son] to be alone.' Sims told her he was in East Oakland, which she testified made her think he would not come.

"Ward's girlfriend's younger cousin testified that meanwhile, McDaniels 'said something ... like, "You bitches aren't from around here,"' and told her and her cousins to leave. Ward's girlfriend's older cousin heard him say that 'no one was gonna do anything to his brother,' apparently referring to Harbin, and both cousins saw him run into a house. The older cousin claimed she then saw him come back out holding a 'long gun.' Fearing that 'something bad was getting ready to happen,' she urged Ward's girlfriend and their other cousin to leave, but Ward's girlfriend refused. Her cousins left, and Ward's girlfriend walked to R.B.'s house across the street to get a towel for her face, which was bleeding.

"Shortly afterward, Ward, Sims, and Ambrose arrived at 30th and Chestnut. Ward was driving either a purple or blue Acura. Ward and McDaniels were friends, and both Reed and R.B. saw Ward speak to McDaniels. R.B. tried to talk to Ambrose, whom she had known for '[a] real long time,' so she could tell him 'what really happened, because [she knew] people already told him, like, [Reed] ... got pushed and that was just stuck in his head that somebody pushed [Reed].' But when she called his name, Ambrose acted as if he was not 'trying to hear' her and did not respond.

"*F. Harbin Returns, and the Shooting Begins.*
"R.B. testified, and Reed confirmed, that Reed's sister then yelled, '"There that nigga go right there."' R.B. saw Harbin driving down the street in a gray car and heard gunshots. Similarly, Ward's girlfriend testified that before dropping to the ground in R.B.'s house, she saw Harbin driving quickly down 30th and heard numerous gunshots. R.B. testified that she saw first Ambrose and then Sims shooting handguns toward Harbin's car. Reed also testified that before running away from the scene she saw Ambrose shooting toward a car, although she denied that Sims was even there.

"R.B. testified that she also saw Davis, who was the only defendant who had dreadlocks, shooting toward Ambrose and Sims. She could not remember what Davis's gun looked like. To impeach this testimony, Davis introduced evidence that in a police interview soon after the murder, R.B. identified him but specifically denied seeing him shoot.

"Harbin testified that as he was pulling in to park near the house where McDaniels normally hung out, he heard gunshots. One of the shots hit his car, and he realized that he was being targeted. He quickly turned his wheel to try to drive away, but 'a bullet hit [him] in the back' and made him 'inadvertently ... jerk the wheel,' causing his car to crash into a house and turning him perpendicular to the

street. A bystander confirmed that he saw Harbin's car crash and get ‘"lit ... up."'

"Harbin tried to exit from the passenger's side of his car, away from where the gunshots were coming, but the door was blocked by the house's staircase. When he was unable to exit the car, he ‘pulled a gun out from [his] hip and [he] fired through [his] car door' toward ‘the direction of the bullet that hit [him],' but at a downward angle because his arm ‘locked up' when he tried to lift it. Harbin claimed that he shot in self-defense, explaining that he could not see who was shooting but could hear the shots getting louder. He testified, ‘[I]n my mind, they running up on my car and they about to finish me off.' He denied that he would have gone back to Third World had he known he was in danger, saying, ‘These women were hanging with my brother [McDaniels], they were hanging with my cousin. No[ ]where in my mind was I thinking that they were going to try to have me murdered.'

"After Harbin emptied his gun, the gunshots continued. He looked outside and saw McDaniels, who had positioned himself between Harbin and the intersection of 30th and Chestnut. McDaniels was shooting a Glock with an extended magazine toward the intersection, apparently in defense of Harbin, and Harbin later concluded that the louder shots he had interpreted to mean that someone was approaching his car were actually shot by McDaniels. Harbin testified that he backed up his car and drove away as McDaniels continued to shoot the Glock.

"*G. Stills Gives a Rifle to McDaniels.*
"The police interviewed Stills a few weeks after the murder, and portions of his statement were played for the jury. He said that when McDaniels first returned to 30th and Chestnut after the fight between the women ‘and they was making phone calls,' McDaniels told him there was a rifle in the backseat of his car. At that point, Stills, who had a preexisting injury to his arm, told McDaniels, ‘I only got one arm. Like, how am I gonna shoot that mother[ ]fucker?'

"Later, during the shootout, Stills saw McDaniels shooting a Glock, which jammed. After the Glock jammed, McDaniels asked Stills to ‘get his rifle out his car,' a white Mercedes-Benz, and Stills admitted that he ‘grabbed [it] and ... ran to Chestnut and ... handed it to [McDaniels].' Stills then saw McDaniels point the rifle down Chestnut and shoot toward Ambrose. According to Stills, Ambrose was running the other direction while shooting behind him, toward Stills and McDaniels.
...

"*H. Pierce Is Killed and the Shooters Flee.*
"A contractor who was working at Pierce's house that day testified that he saw Pierce arrive home in her car with her children. As she was parking, he heard gunshots, and he dropped to the ground. A neighbor of Pierce's testified that after hearing several gunshots, she looked outside and observed Pierce ‘yelling at her children to run.' The neighbor then saw Pierce fall face-first on the ground as she

7

was following her children up the driveway. It was later determined that Pierce died from a single gunshot to the head and neck.

"When the contractor looked outside, he saw a vehicle drive by and two men, one bleeding from the chest, 'chasing after the car.' Similarly, Pierce's neighbor testified that after Pierce collapsed she saw two '[v]ery young' males run down the street with black pistols their hands. They ran toward a dark blue Audi station wagon, where another man was 'waving for them to hurry and get in,' and then all three left in the car.

"Another bystander who was around 28th and Chestnut testified that she heard dozens of gunshots that sounded like 'a wild west shootout.' The shots originally seemed like they were coming from about a block away but then got closer. She looked out the window and saw a dark 'newer model car ... [l]ike an Audi' driving down Chestnut, away from 30th. Two men, one of whom had been shot in the chest and was holding a handgun, were running behind the car, which had another person 'already kind of half-in/half-out of the passenger seat.' The bystander also saw a third man with dreadlocks moving down the sidewalk while pointing a handgun in the direction the two other men were running.

"A woman who lived at 30th and Chestnut testified that she heard several gunshots and saw 10 to 15 men standing in the intersection, some of whom were shooting down Chestnut. Three of the men who were shooting had just come from the vicinity of a white Mercedes-Benz. After retreating toward the back of her house, she looked outside again, and the same three men still appeared to be shooting. According to her, one of them had a rifle, one had a 'larger handgun with [an] extended clip,' and one had a 'regular handgun.' She thought that the man holding the rifle had dreadlocks. [Footnote omitted.] The men then drove away in a light-colored car.

"*I. The Aftermath and the Physical Evidence.*
"Harbin's girlfriend testified that she returned to Third World with two other women, intending '[t]o go fight the girls that jumped [her].' As they arrived, they 'heard a lady was killed or unconscious,' and they saw Pierce lying on the ground. Harbin's girlfriend walked up Chestnut and saw Ambrose lying on the side of a house a few doors down from Pierce's, 'bleeding really bad.' Harbin's girlfriend had grown up with Ambrose and characterized him as 'like a little cousin to [her],' and she was recorded yelling at police officers to help him. Sims had been shot as well and also eventually arrived at the hospital.

"Meanwhile, as Ward's girlfriend's cousins were trying to return to the scene, they heard gunshots. They saw McDaniels and another person driving away in Ward's Acura, which the older cousin found 'suspicious' since Ward had just bought it from her sister. Stills also told the police that after the shooting was over, he saw McDaniels steal Ward's car and leave the scene.

"Harbin, who was shot in the back, managed to return to his uncle's house, and his Buick was later towed from Mead. Its rear window had been shot out from outside, and it had several holes and ricochet

8

marks caused by other shots fired from both inside and outside the vehicle. Consistent with Harbin's testimony that he had fired a .45-caliber handgun, a .45-caliber shell casing was recovered from the floorboard behind the driver's seat, and another .45-caliber shell casing shot by the same gun was found underneath the car. Harbin testified that the day after the murder he traded the gun he had shot for a 9mm-caliber Taurus handgun, which he had when he was arrested, and his .45-caliber gun was never recovered.

"The evidence showed that at least five different weapons in addition to Harbin's .45-caliber handgun were fired at the scene. First, a Springfield Armory semiautomatic .45-caliber pistol, which had Sims's blood on it, and two boxes of .45-caliber ammunition were recovered from Reed's sister's house. A cluster of five casings discharged by that gun were recovered near 30th and Chestnut.

"Second, a Bersa mini Firestorm .40-caliber pistol, which had Ambrose's blood on it, was recovered near the driveway where Ambrose was found. Nine casings from the Firestorm were found at the scene.

"Third, a Glock .40-caliber pistol that fired 20 of the casings found at the scene was recovered from the house of a second girlfriend of Harbin's. This girlfriend testified that four days after the murder, she found the gun hidden in her reclining chair and placed it in a bag in the closet. The Glock had DNA from three people on it, including Harbin. Implying that the Glock belonged to McDaniels, Harbin testified that he handled the weapon when hiding it at his girlfriend's house but that it was not his.

"Fourth, four .223-caliber casings fired by the same gun were recovered at the scene. A criminalist testified that an AR-15 assault rifle is the most common type of gun used to shoot such cartridges. No AR-15 or other similar gun was ever recovered, but boxes of .223-caliber ammunition were also recovered from Harbin's second girlfriend's house. The girlfriend testified that within a few days of the murder, Harbin and McDaniels arrived at her house. They had a long, black gun on the backseat floor of their car, and she refused to let Harbin bring it in the house. Harbin testified that he did not know what ultimately happened to this weapon, which he did not know McDaniels had until after the shooting.

"Finally, a single .38/.357-caliber bullet shot by an unrecovered firearm was found a couple feet from Pierce's head and had her DNA on it. The criminalist testified that the bullet was of a caliber one "would normally associate with a revolver," a type of gun that does not expend casings. The evidence tended to suggest, by process of elimination, that Davis fired this gun."

*J. Procedural History.*
Sims was charged with one count of murder with the accompanying allegations that he personally used a firearm, personally and intentionally discharged a firearm, and personally and intentionally discharged a firearm causing death. [FN 2] He was also charged with the attempted murder of Harbin and one count of unlawful firearm activity. [FN 3]

9

1

[FN 2: The murder charge was brought under Penal Code section 187, subdivision (a), and the firearm enhancements were alleged under Penal Code sections 12022.5, subdivision (a), and 12022.53, subdivisions (b) and (g) (personal use of firearm), section 12022.53, subdivision (c) (personal and intentional discharge of firearm), and sections 12022.7, subdivision (a), and 12022.53, subdivision (d) (personal and intentional discharge causing death). All further statutory references are to the Penal Code.]

[FN 3: The attempted murder charge was brought under sections 187, subdivision (a), and 664, with firearm enhancements alleged under the same statutes as were those attached to the murder charge. The charge of unlawful firearm activity was brought under section 29805, based on a 2014 conviction under section 25400 for carrying a concealed firearm.]

Before the presentation of evidence began, the trial court granted the prosecution's motion to dismiss the attempted murder charge, and the jury was instructed not to decide that count. After the close of evidence, Sims pleaded no contest to unlawful firearm activity. The jury then convicted him of second degree murder and found true the firearm allegations.

At sentencing, the trial court granted the prosecution's motion to strike the firearm enhancements in the interest of justice. The court sentenced Sims to 15 years to life in prison for murder and a concurrent term of two years in prison for unlawful firearm activity. Among other monetary charges, the court also imposed a $10,000 restitution fine and imposed and stayed a $10,000 parole revocation restitution fine.

*People v. Sims*, No. A155339, 2020 WL 3780057, at *1–8 (Cal. Ct. App. July 7, 2020)

(unpublished) (ellipses in original).

## II.      LEGAL STANDARD

A federal court may entertain a habeas petition from a state prisoner "only on the ground that he is in custody in violation of the Constitution or laws or treaties of the United States." 28 U.S.C. § 2254(a). Under the Antiterrorism and Effective Death Penalty Act ("AEDPA"), a district court may not grant habeas relief unless the state court's adjudication of the claim "(1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established

United States District Court
Northern District of California

1    Federal law, as determined by the Supreme Court of the United States; or (2) resulted in a decision

2    that was based on an unreasonable determination of the facts in light of the evidence presented in

3    the State court proceeding." *Id*. § 2254(d); *see Williams v. Taylor*, 529 U.S. 362, 412 (2000).

4    When there is no reasoned opinion from the highest state court to consider the petitioner's claims,

5    "the federal court should 'look through' the unexplained decision to the last related state-court

6    decision that does provide a relevant rationale." *Wilson v. Sellers*, 138 S. Ct. 1188, 1192 (2018). In

7    addition, the federal habeas court must presume correct any determination of a factual issue made

8    by a state court unless the petitioner rebuts the presumption of correctness by clear and convincing

9    evidence. 28 U.S.C. § 2254(e)(1); *Kirkpatrick v. Chappell*, 926 F.3d 1157, 1170 (9th Cir. 2019).

10        The U.S. Supreme Court has made clear that § 2254(d)(1) consists of two distinct clauses.

11   *Williams*, 529 U.S. at 412–13. "Under the 'contrary to' clause, a federal habeas court may grant

12   the writ if the state court arrives at a conclusion opposite to that reached by [the U.S. Supreme

13   Court] on a question of law or if the state court decides a case differently than th[e] Court has on a

14   set of materially indistinguishable facts." *Id*. "Under the 'unreasonable application' clause, a

15   federal habeas court may grant the writ if the state court identifies the correct governing legal

16   principle from this Court's decisions but unreasonably applies that principle to the facts of the

17   prisoner's case." *Id*. at 413. It is important, however, that a federal court not issue the writ "simply

18   because that court concludes in its independent judgment that the relevant state-court decision

19   applied clearly established federal law erroneously or incorrectly." *Id*. at 411. The pertinent

20   question is whether the state court's application of clearly established federal law was "objectively

21   unreasonable." *Id*. at 409.

22        For the purposes of both clauses, "clearly established Federal law" consists of Supreme

23   Court holdings (excluding dicta) existing at the time of the relevant state court decision, because

24   only the Supreme Court's holdings are binding on the state courts. *See Williams*, 529 U.S. at 412.

25   Circuit law may nevertheless be "persuasive authority" for purposes of determining whether a

state court decision is an unreasonable application of Supreme Court precedent. *Clark v. Murphy*, 331 F.3d 1062, 1069 (9th Cir. 2003), *overruled on other grounds by Lockyer v. Andrade*, 538 U.S. 63 (2003).

As apparent from the foregoing, AEDPA sets forth a highly deferential standard for evaluating state court rulings: it requires a state prisoner "show that the state court's ruling on the claim being presented in federal court was so lacking in justification that there was an error well understood and comprehended in existing law beyond any possibility for fair-minded disagreement." *Harrington v. Richter*, 562 U.S. 86, 103 (2011).

Moreover, even if a petitioner establishes a constitutional violation under the relevant standard, that is only the first hurdle the petitioner must clear. Habeas petitioners "are not entitled to habeas relief based on trial error unless they can establish that it resulted in 'actual prejudice.'" *Davis v. Ayala*, 576 U.S. 257, 267 (2015) (quoting *Brecht v. Abrahamson*, 507 U.S. 619, 637 (1993)). "Under this test, relief is proper only if the federal court has grave doubt about whether a trial error of federal law had substantial and injurious effect or influence in determining the jury's verdict." *Davis*, 567 at 267-68 (internal quotations omitted).

With these principles in mind, the Court now addresses Sims's claims.

## III.   DISCUSSION

Mr. Sims's claims concern the prosecutor's closing arguments. The California Court of Appeal explained the facts underlying Mr. Sims's claims as follows:

> Sims's claims revolve around the prosecutor's general theme that the defendants on trial had a defense of "not our fault." In his initial closing argument, after discussing at length the defendants' claims that they were not to blame for Pierce's death, the prosecutor summarized, "It's none of their fault. That's what they're asking you to find, ladies and gentlemen. They're asking you to find that none of them are responsible. None of them are responsible for causing this shootout a block away from McClymonds High School." Sims's trial counsel objected that "that's not what I'm going to ask," and the trial court overruled the objection on the basis that "this is argument." Counsel insisted, "So he can't tell them what I'm going to ask," and

the court responded, "It's argument, [counsel]," and told the prosecutor to continue.

The prosecutor returned to this theme numerous times throughout closing argument, including on rebuttal. For example, after discussing the legal principles governing the case, he stated, "In lay terms, this is not a self-defense case. It's not. That's what they'd have you believe, though, so that none of them are responsible. Chyemil Pierce's death? Oh, well." Similarly, in arguing that "responsibility attach[ed]" once the defendants began preparing for the confrontation between the two groups, the prosecutor said, "Getting your arsenal ready, making preparations. Right? You don't get to say it's not my fault. Because in the end, no matter what fancy legalese is used, that's their defense boiled down to the basic premise: It's not my fault. Mr. Sims, 'It's not my fault she's dead.' Mr. Davis, 'It's not my fault she's dead.' Mr. Harbin, 'It[ ] ain't my fault.' Mr. Stills, 'It ain't my fault. I didn't even fire a gun.' [¶] Again, no matter how fancy the words are, that's the defense. It's not my fault."

The prosecutor also contrasted Reed and Ward, who he argued had accepted responsibility by entering pleas and were remorseful, to the defendants standing trial. For example, the prosecutor argued:

"We know that Joneria Reed has pled guilty. We know she pled guilty to a murder. The terms were very clear; right? And she did it because there's a benefit to her. There's no getting around that; right? She comes and tells the truth at this trial and the next, and it gets reduced to six years on a manslaughter; right?

"How is Ms. Reed different than the gentlemen here? Her testimony is ... I called men to come and defend my honor. I didn't tell them to shoot. I wouldn't do that.

"You saw when she's up there crying. She's crying because she feels bad about what happened. That's how she's different.

"But is she liable? Does she have responsibility? Yes. Has she accepted responsibility? Yes. But it's none of their fault.

"Dijon Ward, charged with [being] an accessory. He's resolved his case; all right? But again, 'It's not my fault.'"

The prosecutor also raised this contrast on rebuttal, arguing, "Joneria Reed has accepted her responsibility. You've learned Dijon Ward has already pled to [being] an accessory; he's accepted his responsibility. [The] position [of the defendants on trial] is we're not responsible, which is what I told you in the beginning of the case and in the beginning of arguments this case was about. It's not our fault."

The prosecutor acknowledged at sentencing, however, that Sims "ha[d] always expressed remorse for his role in this crime. [¶] He expressed remorse expressly as well as implicitly when he wanted to resolve this case early on. Unfortunately for Mr. Sims, given the status of the case and everyone's involvement, I indicated to him that I would not be able to allow him to resolve his case, even though again he had expressed remorse from the beginning." Because Sims "never

shot anyone and ... wasn't the one who was responsible or directly responsible for Chyemil Pierce's death," the prosecutor moved to strike the firearm enhancements in the interest of justice under section 12022.53, subdivision (h). The trial court granted the motion, stating, "I think it's a magnanimous gesture on behalf of the People," which "effectively removed that 25-year-to-life sentence" that would have otherwise been imposed under section 120225.3, subdivision (d), as well as any shorter terms for the other enhancements.

Sims also objects to the prosecutor's use of two hypotheticals during closing argument. The first involved a scenario, which originally came up in opening statements, in which three boys who have a preexisting conflict prepare for and get into a snowball fight during which a car window is broken. In his closing argument, the prosecutor returned to this scenario, stating that he thought it was "a good example ... because it allows you to ask the question: When does responsibility begin; right? What is the tipping point; right?" Acknowledging that "it's a very simple analogy ... [and] a little bit playful," the prosecutor argued that the defendants were in a similar position to the boys because their stance was that "despite the preparation, despite everything that came before, it's none of their fault. None of them are responsible."

The prosecutor raised the second hypothetical on rebuttal, in response to Davis's counsel's hypothetical involving shooting into a room full of people. The prosecutor argued:

"Let's assume that [Davis's attorney] and I ... are going to have a shooting right here. We're not friends. We have a strong dislike. He stands that way. I stand here. And all of you are present and we're about to shoot. What are all of you gonna do? Run, duck, hide.

"Because is it foreseeable that one of you might get hit? Absolutely. Absolutely. What about if we're shooting at that back corner? Is everybody gonna feel safe? Absolutely not. Absolutely not. Is it foreseeable that an innocent person might get hit when there's a shootout? Oh, c'mon, the answer's simple. It's yes."

Returning to this hypothetical later, specifically in relation to Sims's arguments "about proximate cause and intervening superseding causes," the prosecutor said,

"[M]e and [Davis's attorney] have a shootout in that corner. I guarantee you guys aren't going to be eating popcorn watching because you're going to know something—'It's time for us to go.'

"The only other way out of here is that door, which we know is locked. That door, which you're not going to go to because we're going to shoot out over there. So you're going to all [be] piling over here at this door.

"But [Davis's attorney, Sims's attorney, Harbin's attorney, and Stills's attorney], their position is, if there's a shootout right there, it's not foreseeable that any of you are going to get hit. If we decide we're going to show up and have a shootout, it's not foreseeable that poor citizens who are literally right across the courtroom from us are going

1   to get hit. That wouldn't be our fault. If we miss each other, oh, well.
    You should charge us with trying to kill each other. Not with one of
2   the jurors who may get hit. It's not our fault."

3   Sims's counsel objected that "[t]his [was] improper argument
    involving the jury and setting up a situation in this courtroom," and
4   the trial court overruled the objection.

5   *Sims*, 2020 WL 3780057, at *8–10.

6   Based on these arguments by the prosecutor, Sims asserts the following claims for relief:

7   1.   "The prosecutor made a false argument to the jury, violating Mr. Sims's right to due

8        process of law under the Fourteenth Amendment," Pet., Attachment A at 1-7;

9   2.   When the prosecutor "compared Mr. Sims unfavorably to his co-defendants who pled

10       guilty, one of whom testified and expressed remorse," "[t]he prosecutor infringed

11            a.   Mr. Sims's federal constitutional right to trial,

12            b.   his constitutional right to present a defense,

13            c.   his right not to testify, and

14            d.   his constitutional right to due process," *id*. at 7 (citing "U.S. Const., Amends.

15                 V, VI, & XIV");

16  3.   "The prosecutor invited jurors to penalize Mr. Sims for his decision not to testify, in

17       violation of . . . his rights under the Fifth and Fourteenth Amendments, *id*.;

18  4.   "The prosecutor improperly commented on Mr. Sims's demeanor and (falsely) on his

19       lack of remorse, violating his right to due process under the Fourteenth Amendment,"

20       *id*.;

21  5.   "The prosecutor improperly invoked Mr. Sims's co-defendants' guilty pleas to suggest

22       that Mr. Sims was also guilty, in violation of his right to due process under the

23       Fourteenth Amendment," *id*.;

24

25

United States District Court
Northern District of California

15

6.   "The prosecutor's argument reduced the prosecution's burden of proof and implied that the jury's task was less rigorous than the law requires, violating Mr. Sims's right to due process under the Fourteenth Amendment," *id*. at 8;

7.   "The prosecutor's improper argument positing a hypothetical in which a juror was shot in a courtroom shootout violated Mr. Sims's Fourteenth Amendment right to due process," *id*.;

8.   "Trial counsel was prejudicially ineffective in violation of Mr. Sims's Sixth and Fourteenth Amendment rights: he failed to adequately object to the prosecutor's improper and unconstitutional summation arguments" challenged in Claims 1-7, *id*. at 8; and

9.   "Cumulative error and cumulative prejudice violated Mr. Sims's constitutional rights under the Fifth, Sixth, and Fourteenth Amendments," *id*.

Respondent argues that Claims 1-5, which center on the prosecutor's argument that Mr. Sims was not remorseful, are procedurally defaulted. *See* Resp. at 15-19. Respondent argues that Claim 6, regarding the burden of proof, and Claim 7, regarding the hypothetical posed by the prosecutor, are procedurally defaulted and additionally fail on the merits. *See id*. at 19-23. As to Claim 8, Respondent argues that Mr. Sims's ineffective assistance of counsel arguments are procedurally defaulted as to the errors complained of in Claims 1-6, and fail on the merits as to the errors complained of in Claim 7. *See id*. at 23. Respondent argues that Claim 9 fails because there was no error. *See id*. at 24.

The Court first will explain the law regarding procedural default, then will discuss Claims 1-5 together, and the remaining claims *seriatim*.

**A.      Procedural Default, Generally**

The procedural default doctrine "'bar[s] federal habeas [review] when a state court declined to address a prisoner's federal claims because the prisoner had failed to meet a state

1   procedural requirement.'" *Calderon v. United States District Court*, 96 F.3d 1126, 1129 (9th Cir.

2   1996) (quoting *Coleman v. Thompson*, 501 U.S. 722, 729 (1991)). Federal courts "'will not review

3   a question of federal law decided by a state court if the decision of that court rests on a state law

4   ground that is independent of the federal question and adequate to support the judgment.'" *Id*.

5   Because procedural default is an affirmative defense, the respondent must first adequately plead an

6   independent and adequate state procedural ground for the procedural default. *Bennett*

7   *v. Mueller*, 322 F.3d 573, 586 (9th Cir. 2003). To qualify as "'adequate,'" a state rule must be

8   "'firmly established and regularly followed.'" *Walker v. Martin*, 562 U.S. 307, 316 (2011)

9   (quoting *Beard v. Kindler*, 558 U.S. 53, 60 (2009)). A rule is inadequate only if it is applied in a

10  surprising or unfair manner that operates to discriminate against federal claims. *Id*. at 319-20.

11  Once the government has established the adequacy of the procedural default, the burden shifts to

12  the petitioner, who must then "assert[] specific factual allegations that demonstrate the inadequacy

13  of the state procedure, including citation to authority demonstrating inconsistent application of the

14  rule." *Bennett*, 322 F.3d at 586. If the petitioner cannot do so, the claims are procedurally

15  defaulted.

16          However, there is a limited exception to procedural default where the petitioner can

17  demonstrate: (1) cause for the default and actual prejudice resulting from the alleged violation of

18  federal law, or (2) a fundamental miscarriage of justice. *See McClesky v. Zant*, 499 U.S. 467, 494

19  (1991).

20          The cause standard requires the petitioner to show that "some objective factor external to

21  the defense" prevented petitioner from complying with the state procedural rule. *Murray v.*

22  *Carrier*, 477 U.S. 478, 488 (1986). Objective factors that constitute cause include interference by

23  officials that makes compliance with the state's procedural rule impracticable, and a showing that

24  the factual or legal basis for a claim was not reasonably available to counsel. *See id*. at 493-94. A

25

*United States District Court*
*Northern District of California*

17

petitioner also must show actual prejudice resulting from the errors of which he complains. *Id*. at 494; *United States v. Frady*, 456 U.S. 152, 168 (1982).

**B.     Claims 1-5: Prosecutorial Misconduct Regarding the Comparison of Mr. Sims to Other Defendants**

In Claims 1-5, Sims challenges eight aspects of the prosecutor's closing argument.  See Pet., Attachment A at 1-7. The Court of Appeal found Claims 1-5 procedurally defaulted because defense counsel did not make contemporaneous objections at trial, and declined to reach the merits of these claims. *See Sims*, 2020 WL 3780057, at *11-12 (citing *People v. Hoyt*, 8 Cal. 5th 892, 942 (2020) ("[T]o preserve a claim of prosecutorial misconduct for appeal, 'a criminal defendant must make a timely and specific objection and ask the trial court to admonish the jury to disregard the impropriety.'") (citations omitted)). Specifically, the Court of Appeal held as follows:

> Sims argues that the prosecutor erred in several respects by contrasting him and the other defendants to Reed and Ward. First, Sims complains that by doing so, the prosecutor improperly "argued an implication he knew to be untrue," that Sims had not expressed remorse or accepted responsibility for Pierce's death. (See *People v. Bittaker* (1989) 48 Cal.3d 1046, 1105 [error to lead jury to believe fact prosecutor knows is untrue].) Second, Sims argues the line of argument "invited jurors to penalize [his] reliance on his legal rights" by going to trial and electing not to testify. (See *Griffin v. California* (1965) 380 U.S. 609, 615 [error for prosecutor to comment on defendant's decision not to testify]; *United States v. Smith* (11th Cir. 1991) 934 F.2d 270, 275 [error for prosecutor to state that defendant failed to take responsibility for his actions whereas his co-defendants entered pleas].) Third, Sims argues that in comparing him to Reed and Ward, the prosecutor improperly commented on facts not in evidence, including Sims's supposed lack of remorse. (See *People v. Mendoza* (2016) 62 Cal.4th 856, 906 [prosecutor cannot base argument on facts not in evidence]; *People v. Boyette* (2002) 29 Cal.4th 381, 434 [generally error to comment on nontestifying defendant's courtroom demeanor].) And finally, Sims claims that the prosecutor improperly implied that he was guilty by association with Reed and Ward. (See *Lopez, supra*, 42 Cal.4th at p. 967 [error to invite finding of guilt by association].)
>
> We agree with the Attorney General that Sims forfeited his arguments by failing to object on any of these grounds below. Sims contends that once the trial court overruled his objection to the prosecutor's claim that the general defense was "not our fault," any further objections would have been futile. Although acknowledging that he "did not specifically object to the prosecutor's arguments regarding Reed's and Ward's acceptance of responsibility," Sims claims that "the error

is preserved for review because it [was] part and parcel" of the prosecutor's more general theme about the defendants' position.

Sims's objection was merely that his defense was not "it's not my fault," and there were no objections whatsoever to the prosecutor's invocation of Reed and Ward as contrasts to the defendants on trial. Thus, the issues Sims now raises were not presented to the trial court. Moreover, he did not ask for the jury to be admonished, and he does not claim on appeal that any of the improper aspects of the prosecutor's argument could not be cured by further instruction. As a result, his claims are forfeited. (See *Hoyt*, *supra*, 8 Cal.5th at pp. 942–943.) We disagree with Sims that the forfeiture question is "close and difficult," and we decline to exercise our discretion to consider his claims on the merits.

Nor has Sims demonstrated that his trial counsel rendered ineffective assistance by failing to object. Sims fails to grapple fully with the requirement that where, as here, the record is silent about counsel's reasons for not objecting, a defendant must show "there simply could be no satisfactory explanation." (*Mai*, *supra*, 57 Cal.4th at p. 1009.) Sims cursorily asserts, as to all the claims of prosecutorial error, that "[t]here can be no tactical reason for counsel to fail to adequately object," particularly given that counsel did object to related issues twice, and that the failures here were "a matter of competence, not tactics." In his reply brief, Sims clarifies that "[w]hile deciding *whether* to object may in some cases be tactical, the adequacy of an objection is a matter of competence."

Sims's counsel's objections to the characterization of the defendants' general defense and the shootout hypothetical were not tied to any mentions of Reed and Ward, however, and we thus cannot conclude that these objections were merely inadequate attempts to challenge the comparison of Sims to the defendants who entered pleas. And as the case law recognizes, there are a variety of tactical reasons defense counsel may decide not to object even if the objection has merit. (See, e.g., *People v. Huggins* (2006) 38 Cal.4th 175, 206 [rational not to object to avoid calling attention to prosecutor's remarks]; *People v. Frierson*, *supra*, 53 Cal.3d at p. 749 [rational to counter prosecutor's point with argument instead of objecting].) We also note that none of the attorneys for the other defendants on trial objected to the discussion of Reed and Ward, further suggesting that the omission was within the range of competent representation. In short, Sims fails to demonstrate that his counsel could have had no legitimate tactical reason for not objecting to the prosecutor's arguments involving Reed and Ward.

*Sims*, 2020 WL 3780057, at *11-12.

Respondent argues that Claims 1-5 cannot be reviewed by this Court. Resp. at 17 (citing

*Coleman*, 501 U.S. at 750). To support this argument, Respondent points out that federal courts,

including the Supreme Court and the Ninth Circuit, have repeatedly recognized that California's

1    contemporaneous objection rule constitutes a valid procedural default. *Id*. (citing *Zapata v.*

2    *Vasquez*, 788 F.3d 1106, 1112 (9th Cir. 2015) (failure to object to prosecutorial misconduct in

3    closing argument); *Rich v. Calderon*, 187 F.3d 1064, 1070 (9th Cir. 1999) (same); *Featherstone v.*

4    *Estelle*, 948 F.2d 1497, 1506 (9th Cir. 1991) (same)).

5          Under California's contemporaneous objection rule, "'a criminal defendant must make a

6    timely and specific objection *and* ask the trial court to admonish the jury to disregard the

7    impropriety.'" *People v. Powell*, 6 Cal. 5th 136, 171 (2018) (emphasis added) (quoting *People v.*

8    *Clark*. 52 Cal.4th 856, 960 (2011)). *See also People v. Dykes*, 46 Cal. 4th 731, 760 (2009) ("'[A]

9    defendant may not complain on appeal of prosecutorial misconduct unless in a timely fashion—

10   and on the same ground—the defendant made an assignment of misconduct *and* requested that the

11   jury be admonished to disregard the impropriety.'") (emphasis added) (quoting *People v. Stanley*,

12   39 Cal. 4th 913, 952 (2006)).

13         The Ninth Circuit has recognized and applied the California contemporaneous objection

14   rule in affirming denial of a federal petition on grounds of procedural default where there was a

15   complete failure to object at trial. *See Fauber v. Davis*, 43 F.4th 987, 1002 (9th Cir. 2002);

16   *Inthavong v. Lamarque*, 420 F.3d 1055, 1058 (9th Cir. 2005); *Paulino v. Castro*, 371 F.3d 1083,

17   1092-93 (9th Cir. 2004); *Vansickel v. White*, 166 F.3d 953, 957-58 (9th Cir. 1999). The Ninth

18   Circuit also has applied the contemporaneous objection rule where defense counsel made an

19   objection but failed to follow through with a request that the jury be admonished. *See Nevius v.*

20   *Sumner*, 852 F.2d 463, 470 (9th Cir. 1988) (finding claim was procedurally barred where

21   defendant objected, but did not request admonition to jury); *Nieblas v. Rimmer*, 203 F. App'x 56,

22   58 (9th Cir. 2006) (finding claims procedurally defaulted where defendant failed to "request any

23   jury admonishments as required by California law to preserve issues for appeal," because this is a

24   requirement under California's contemporaneous objection rule) (citing *People v. Cunningham*, 25

25   Cal. 4th 926, 1000-01 (2001)). The Ninth Circuit will not apply the contemporaneous objection

1   rule where defense counsel perfected an objection but the trial court in its discretion declined to

2   consider the objection on the merits. *See Melendez v. Pliler*, 288 F.3d 1120, 1126 (9th Cir. 2002).

3          Considering Ninth Circuit precedent on this issue, the Court finds the contemporaneous

4   objection rule is firmly established and regularly followed. Respondent has adequately pled the

5   existence of an independent and adequate state ground for the procedural default of Claims 1-5.

6   Additionally, the Court carefully reviewed the record and found no relevant objections perfected

7   by counsel, nor objections which the trial court declined to review on their merits. *See generally,*

8   Resp., Ex. 2 ("Transcript").

9          Were Sims to challenge the adequacy of the state procedural rule, he would bear the

10  burden of asserting factual allegations demonstrating the inadequacy of the state procedure.

11  *Bennett*, 322 F.3d at 585-86. But as noted above, Sims failed to file a Traverse, and thus did not

12  even attempt to challenge the adequacy of California's contemporaneous objection rule. Because

13  Sims has not challenged the adequacy of the state procedure, Claims 1-5 are procedurally barred.

14  *See Coleman*, 501 U.S. at 729-730.

15         Sims also has failed to demonstrate the cause and prejudice which would excuse this

16  default. As noted above, he failed to file any Traverse in the instant action. Sims therefore has

17  failed to identify any "objective factor external to the defense" that prevented him from complying

18  with the state procedural rule. *Murray*, 477 U.S. at 488.

19         In addition, the Court agrees with the Court of Appeal that these issues were "harmless":

20         The jury was instructed that it "must not be biased against [a]
21     defendant just because he has been arrested, charged with a crime, or
       brought to trial," and that "[a] defendant has an absolute constitutional
       right not to testify." Indeed, the jury was specifically warned not to
22     "consider, for any reason at all, the fact that defendants Sims, Stills,
       and Davis did not testify." The jury was also instructed that it must
23     follow the law as explained by the trial court, not counsel, and that
       counsel's remarks in closing arguments are not evidence. Sims does
24     not challenge the correctness of these or any of the other instructions
       given, including those on what he characterizes as "[t]he only real
       questions before the jury" —whether he fired in defense of himself or
25     Ambrose and whether he proximately caused Pierce's death. Thus,

United States District Court
Northern District of California

> even if the jury might have perceived the prosecutor's comments about Reed and Ward as an invitation to convict Sims on an improper basis, the instructions adequately dispelled that risk. In sum, even if Sims's counsel's performance had been deficient, there is no "reasonable probability that ... the outcome of the proceeding would have been different" had counsel objected to the challenged remarks. (*Mai*, *supra*, 57 Cal.4th at p. 1009.)

*Sims*, 2020 WL 3780057, at *12. Because Sims suffered no actual prejudice from the alleged errors, any cause-and-prejudice argument would fail. *See Murray*, 477 U.S. at 494-95 (explaining that actual prejudice must be shown) (citing *Engle v. Isaac*, 456 U.S. 107, 134 n. 43 (1982); *Francis v. Henderson*, 425 U.S. 536, 542 (1976)).

Because Claims 1-5 were procedurally defaulted, and Sims has failed to demonstrate cause and prejudice – or indeed to raise any arguments at all – he is not entitled to relief on these claims.

## C.     Claim 6: Prosecutorial Misconduct Regarding the Burden of Proof

In Claim 6, Sims argues that the prosecutor's statements led the jury to believe the burden of proof fell below the reasonable doubt standard. *See* Pet., Ex. A at 8. The Court of Appeal found that Claim 6 was procedurally defaulted:

> 5. The arguments purportedly reducing the burden of proof

> Sims next contends that "[t]he prosecutor's 'it's not my fault' refrain" and use of the snowball-fight and shootout hypotheticals "oversimplified and trivialized" the issue whether his actions proximately caused Pierce to die and reduced the burden of proof "by suggesting that acquittal was not warranted unless the defendants were entirely blameless with respect to [her] death."

> Sims objected to both the prosecutor's first invocation of the "it's not my fault" defense and the shootout hypothetical, but he did not do so on the basis that the prosecutor's remarks effectively lessened the burden of proof. In addition, he did not ask for the jury to be admonished, and he did not object to the snowball-fight hypothetical at all. Nor does he argue that the prosecutor's alleged errors were such that they could not be cured by further instruction. As a result, this claim is forfeited, and we decline to exercise our discretion to review it on the merits. (See *Hoyt*, *supra*, 8 Cal.5th at pp. 942–943.)

> Sims's claim that any forfeiture resulted from ineffective assistance of counsel also fails. Again, Sims does not develop his brief assertion that any reasonably competent attorney would have adequately objected to the challenged arguments. He does cite *Centeno*, in which

22

the Supreme Court held that the defendant's counsel was ineffective for failing to object when the prosecutor purported to illustrate the reasonable-doubt standard by showing a picture of California, describing witness statements about the state that were partially inaccurate, and suggesting the jurors should look at the whole of the evidence to reach a "'reasonable'" determination. (*Centeno*, *supra*, 60 Cal.4th at pp. 665–666, 675–676.) The Court determined that the hypothetical, which had nothing to do with the facts of the case and relied on the jurors' outside knowledge, was improper because it both oversimplified the jury's task and reduced the People's burden of proof. (*Id.* at pp. 670–671.) The Court concluded that counsel could have had no reasonable tactical purpose for failing to object, because the error "[struck] at the most fundamental issue in a criminal case"; the image of California was "too powerful and pivotal to address as irrelevant or trivial argument"; and the prosecutor presented it in rebuttal, meaning defense counsel had no opportunity to respond to it. (*Id.* at pp. 675–676.)

The *Centeno* hypothetical is not analogous to the comments at issue here, which did not explicitly address the burden of proof. As to the "it's not my fault" line of argument, that was essentially what Sims's defense was: He should not be held legally responsible for Pierce's murder because he did not proximately cause her death (or, if he did, he shot in defense of himself or Ambrose). We agree with Sims that an acquittal is not equivalent to a finding of innocence, meaning that the jury could decide to acquit even if it believed he bore some moral responsibility for Pierce's death. (See *People v. Lloyd* (2015) 236 Cal.App.4th 49, 62–63.) But the prosecutor's characterization of the defense did not misstate the law on this point or any other point related to the burden of proof. (Cf. *id.* at p. 62 [prosecutor erred by equating a finding of self-defense to a determination "'the defendant's conduct was absolutely acceptable'" and stating that "'not guilty ... means you didn't commit a crime'"].) As such, Sims's counsel could have reasonably decided not to continue objecting after his initial objection was overruled, especially because he had the opportunity to respond to the prosecutor's characterization of Sims's defense in his own closing argument. (Cf. *Centeno*, *supra*, 60 Cal.4th at pp. 675–676.)

The snowball-fight and shootout hypotheticals also did not incorporate misstatements of the law. In addition, unlike the hypothetical in *Centeno*, they were related to the facts of the case. True, as the prosecutor himself recognized, the snowball-fight hypothetical could be seen as somewhat trivial compared to the actual facts, and the shootout hypothetical also did not perfectly line up with those facts. We also agree with Sims that the prosecutor made some statements that tended to oversimplify the jury's task, including by repeatedly dismissing the concept of proximate cause as "legalese." But such comments pale in comparison to explicit mischaracterizations of the reasonable-doubt standard, and we therefore cannot say that Sims's counsel could have had no tactical reason for failing to object to them. Counsel had the opportunity to respond to the prosecutor's downplaying of proximate cause in his own closing argument, and he could have reasonably elected not to challenge the hypotheticals more vigorously because they did not clearly reduce the People's burden of proof.

23

Finally, even if Sims's trial counsel should have objected to the prosecutor's characterization of Sims's defense, the hypotheticals, or related statements because there was some danger they would lead the jury to approach its task less rigorously, we conclude that the omission was harmless. Again, the jury was instructed to follow the law as explained by the trial court, not counsel, and that counsel's remarks in closing arguments are not evidence. The jury was given CALCRIM No. 240 on causation, CALCRIM No. 620 on causation in homicide cases, and a special instruction on proximate cause, the correctness of which Sims does not challenge. Sims's counsel addressed the issue of causation at length in his closing argument, including urging the jury to reject the prosecutor's "'Snowballs-R-Us' approach to this case, which is if you throw a snowball, you're all guilty for whatever happens thereafter." Thus, the instructions and Sims's argument conveyed that the causation issue was more complicated than the prosecutor portrayed it. Indeed, during deliberations the jury sought clarification of the proximate-cause instruction, suggesting it took the issue seriously.

As for the reasonable-doubt standard more generally, there is no dispute that the jury was properly instructed on it. Sims's counsel also explained the standard in closing, emphasizing the prosecution's burden in that regard. In fact, counsel specifically informed the jury that an acquittal "only means the prosecutor hasn't proven the charge. That doesn't mean that [Sims is] not guilty." Moreover, although counsel argued the causation issue to the jury, his primary strategy was apparently to seek a verdict of voluntary manslaughter on the grounds that if Sims fired shots that proximately caused Pierce's death, he did so when trying to defend himself or Ambrose. At the beginning of his argument, counsel stated, "I don't think [Sims] necessarily ought to be acquitted," and at the end, counsel concluded, "I submit to you on that on the evidence of this case, you should find Mr. Sims guilty of nothing more than manslaughter and to do so will be justice." Thus, counsel's own message suggested acquittal was not the appropriate verdict, further reducing the likelihood that the prosecutor's comments—including the hypotheticals that did not even bear on the self-defense issue—led to a harsher verdict than the jury would have otherwise reached. As a result, there is no reasonable likelihood that Sims would have obtained a more favorable result had counsel more fully objected to the challenged remarks. (*Mai*, *supra*, 57 Cal.4th at p. 1009.)

*Sims*, 2020 WL 3780057, at *13-15.

The Court agrees with the Court of Appeal and with Respondent, *see* Resp. at 19-23, that Claim 6 was procedurally defaulted. As explained above, the contemporaneous objection rule[1] is

---

[1] To comply with the contemporaneous objection rule, California requires criminal defendants to both "make a timely and specific objection *and* ask the trial court to admonish the jury to disregard the impropriety." *Powell*, 6 Cal. 5th at 171 (emphasis added). *See also Clark*, 52 Cal.4th at 960 (same); *Dykes*, 46 Cal. 4th at 760 (same); *Stanley*, 39 Cal. 4th at 952 (same).

24

United States District Court
Northern District of California

1    firmly established and regularly followed, and there thus is an independent and adequate state

2    ground for the procedural default of Claim 6. *See Coleman*, 501 U.S. at 750; *Zapata*, 788 F.3d at

3    1112; *Rich*, 187 F.3d at 1070; *Featherstone*, 948 F.2d at 1506; *Nevius*, 852 F.2d at 470; *Nieblas*,

4    203 F. App'x at 58. As above, Sims did not raise any arguments which would demonstrate cause

5    and prejudice for this default.

6           Even if the California Court of Appeal's decision is interpreted as deciding this claim on

7    the merits, the California Court of Appeal's rejection of Claim 6 was not unreasonable. On habeas

8    review, the relevant question is whether a prosecutor's alleged misconduct "so infected the trial

9    with unfairness as to make the resulting conviction a denial of due process." *Jones v. Ryan*, 691

10   F.3d 1093, 1102 (9th Cir. 2012) (quoting *Darden*, 477 U.S. at 181). "To constitute a due process

11   violation, the prosecutorial misconduct must be of sufficient significance to result in the denial of

12   the defendant's right to a fair trial." *Greer v. Miller*, 483 U.S. 756, 765 (1987) (internal quotation

13   marks and citation omitted).

14          Here, the California Court of Appeal expressly found that the prosecutor "did not misstate

15   the law on this point or any other point related to the burden of proof," and that "the jury was

16   properly instructed on" "the reasonable-doubt standard." *Sims*, 2020 WL 3780057, at *14, 15.

17   Because "a state court's interpretation of state law . . . binds a federal court sitting in habeas

18   corpus," this Court may not second-guess the California Court of Appeal's determination that the

19   jury was accurately instructed as to the burden of proof. *Bradshaw v. Richey*, 546 U.S. 74, 76

20   (2005); *see also King v. Soto*, No. 14-CV-03554-BLF, 2017 WL 2404982, at *20 (N.D. Cal. June

21   2, 2017) (under *Bradshaw*, federal habeas court was bound by state appellate court's finding that

22   jury instruction was an accurate statement of the law and did not reduce the burden of proof).

23   Moreover, the Court has reviewed the prosecutor's closing statements, and found nothing that

24   suggested the prosecution did not bear the burden of proof, nor anything to suggest to the jury that

25   the burden of proof fell lower than reasonable doubt. *See* Tr. at 2096:21-2151:21, 2277:4-2298:12.

The trial court also explained the concept of reasonable doubt to the jury, *see id*. at 2301:26-2302:13, and repeatedly reminded the jury that the prosecutor bore the burden of proving its case beyond a reasonable doubt, *see id*. at 2304:9-13, 2305:1-4, 2307:26-28, 2312:14-17, 2315:18-20, 2321:21-24, 2323:6-19, 2324:11-15, 2325:4-6, 2326:15-17, 2327:3-5, 2327:17-19. Thus, the California Court of Appeal's rejection of Sims's claim was not contrary to, or an unreasonable application of, clearly established Supreme Court law.

For these reasons, Sims is not entitled to relief on Claim 6.

**D.      Claim 7: Prosecutorial Misconduct Regarding a Hypothetical**

In Claim 7, Sims argues that the prosecutor improperly posed a hypothetical to the jury which invited jurors to imagine themselves in the place of the victim. *See id*. The Court of Appeal found that Claim 7 was procedurally defaulted:

> 4. The shootout hypothetical
>
> Sims also claims that the prosecutor's shootout hypothetical was improper because it "'"invite[d] an irrational, purely subjective response"'" by "[a]sking jurors to put themselves in the place of a victim." (Quoting *People v. Redd* (2010) 48 Cal.4th 691, 742.) He also objects that the hypothetical "significantly strayed from the facts of the case" by involving a closed courtroom from which there was no escape, thus "amplif[ying] the fear jurors would feel."
>
> We agree with the Attorney General that Sims also forfeited this claim. Although acknowledging that Sims eventually objected to the hypothetical, the Attorney General points out that the prosecutor started to develop it earlier without objection. We need not determine whether the objection was untimely for this reason, however, because Sims independently forfeited the claim by failing to request that the jury be admonished. (See *Hoyt*, *supra*, 8 Cal.5th at pp. 942–943.) Again, he does not contend that it would have been impossible to cure the alleged error by further instruction, and we decline to exercise our discretion to consider the claim on the merits.
>
> Sims also fails to demonstrate that the forfeiture resulted from ineffective assistance of counsel. He complains that the hypothetical improperly invited the jurors to put themselves in the place of a victim, citing several decisions in which such rhetoric was deemed prosecutorial error. In those cases, however, the prosecutors focused on the actual victims' experiences, explicitly asking the jurors to imagine themselves in the place of the victims (or, in one case, the victim's mother). (*People v. Stansbury* (1993) 4 Cal.4th 1017, 1057; *People v. Pensinger* (1991) 52 Cal.3d 1210, 1250 [victim's mother]; *People    v.    Vance* (2010)    188    Cal.App.4th    1182,

26

1192; *People v. Simington* (1993) 19 Cal.App.4th 1374, 1378–1379.) As our colleagues in Division Two of this court have explained, this "tactic of advocacy ... [is] universally condemned across the nation ... because it is a blatant appeal to the jury's natural sympathy for the victim." (*Vance*, at p. 1188.) Here, in contrast, the hypothetical's primary focus was foreseeability, not the experience of Pierce (or any other bystander during the actual crime). Thus, the hypothetical is not comparable to the direct appeals to jurors' sympathy that are typically disallowed. Given this distinction, Sims's counsel could have reasonably elected not to object immediately and not to ask for a curative instruction after the trial court overruled his eventual objection. (See *Lopez*, *supra*, 42 Cal.4th at p. 970 [counsel not ineffective for failing to object to prosecutor's hypotheticals involving jurors].)

Even if counsel should have more thoroughly objected to the shootout hypothetical and requested an admonition, the omission did not cause prejudice to Sims. As the Attorney General suggests, the hypothetical "did not compare in intensity and emotion" to victim-sympathy arguments that have been held harmless in other cases, including in some of the decisions Sims cites. (See, e.g., *People v. Stansbury*, *supra*, 4 Cal.4th at p. 1057; *People v. Fields* (1983) 35 Cal.3d 329, 361–363; *People v. Simington*, *supra*, 19 Cal.App.4th at pp. 1378–1379.) Further reducing any risk that the jurors would respond emotionally, discussion of the hypothetical comprised a small portion of the prosecutor's closing arguments (see *Stansbury*, at p. 1057), and the jury was instructed not to "let bias, sympathy, prejudice, or public opinion influence [its] decision," including any "bias for or against the witnesses, attorneys, defendant[s] or alleged victims." (See *People v. Rich* (1988) 45 Cal.3d 1036, 1089–1090.) In short, we conclude it is not reasonably probable that Sims would have obtained a more favorable result had counsel more fully objected to the shootout hypothetical. (*Mai*, *supra*, 57 Cal.4th at p. 1009.)

*Sims*, 2020 WL 3780057, at *13.

The Court agrees with the Court of Appeal and Respondent, *see* Resp. at 19-23, that Claim 7 was procedurally defaulted. The contemporaneous objection rule is an independent and adequate state ground for the procedural default of Claim 7. *See Coleman*, 501 U.S. at 750; *Zapata*, 788 F.3d at 1112; *Rich*, 187 F.3d at 1070; *Featherstone*, 948 F.2d at 1506; *Nevius*, 852 F.2d at 470; *Nieblas*, 203 F. App'x at 58. As above, Sims did not raise any arguments which would demonstrate cause and prejudice for this default.

Even if the California Court of Appeal's decision is interpreted as deciding this claim on the merits, the California Court of Appeal's rejection of Claim 7 was not unreasonable because the

27

1    alleged misconduct was not "of sufficient significance to result in the denial of the defendant's

2    right to a fair trial." *Greer*, 483 U.S. at 765.

3            Although it is true that a prosecutor may not make comments calculated to arouse the

4    passions or prejudices of the jury, *Viereck v. United States*, 318 U.S. 236, 247-48 (1943), the

5    prosecutor did not do so here. Under *Darden v. Wainwright*, 477 U.S. 168, 181 (1986), the first

6    question in analyzing whether the prosecutor violated *Viereck*'s prohibition is whether the

7    prosecutor's remarks were improper; if so, the next question is whether such conduct infected the

8    trial with unfairness. *Tan v. Runnels*, 413 F.3d 1101, 1112 (9th Cir. 2005) (summarizing the lines

9    of inquiry identified in *Darden*); *see also Deck v. Jenkins*, 814 F.3d 954, 978 (9th Cir. 2016)

10   (recognizing that *Darden* remains the federal law regarding a prosecutor's improper

11   comments/remarks for AEDPA review purposes).

12          Here, as the California Court of Appeal found, Sims's claim would fall at the first hurdle

13   because the prosecutor's hypothetical was not improper. Rather than a "direct appeal[] to jurors'

14   sympathy that [is] typically disallowed," the California Court of Appeal found that "the

15   hypothetical's primary focus was foreseeability." *Sims*, 2020 WL 3780057, at *13-15. The Court

16   has reviewed the record and agrees. The prosecutor's comments, taken in context, do not appear to

17   be designed to inflame the jury, but instead to illustrate the legal concept of proximate cause. *See*

18   Tr. at 2282:22-2282:5, 2292:20-2293:12. Indeed, the sentence beginning this section of the

19   prosecutor's argument makes clear that the prosecutor's discussion of proximate cause was a

20   response to causation arguments made by defense counsel, *see id* at 2280:28-2281:1, 2282:12-15,

21   who had spoken at length about causation and foreseeability, even summarizing *Palsgraf* and

22   *Wagon Mound* for the jury, *see id*. at 2267:8-2272:10. Defense counsel argued that the victim's

23   death was not a sufficiently foreseeable result of the shootout; the prosecution responded that the

24   jury must decide this issue, and illustrated causation with the shootout hypothetical. Amid the

25   shootout hypothetical, the prosecutor even reminded jurors to "base your decision on the evidence

United States District Court
Northern District of California

1   and the law." *Id.* at 2292:16-18. Taken in context, the Court cannot say that the state appellate

2   court's rejection of Claim 7 was contrary to, or an unreasonable application of, clearly established

3   Supreme Court law.

4         For these reasons, Sims is not entitled to relief on Claim 7.

5   **E.      Claim 8: Ineffective Assistance of Counsel**

6         Sims contends that his counsel was ineffective in failing to object to the misconduct

7   alleged in Claims 1-7.

8         Sims must establish two things to prevail on a Sixth Amendment ineffectiveness of counsel

9   claim. First, he must establish that counsel's performance was deficient, i.e., that it fell below an

10  "objective standard of reasonableness" under prevailing professional norms. *Strickland v.*

11  *Washington*, 466 U.S. 668, 687-88 (1984). Second, he must establish that he was prejudiced by

12  counsel's deficient performance, i.e., that "there is a reasonable probability that, but for counsel's

13  unprofessional errors, the result of the proceeding would have been different." *Id.* at 694. A court

14  need not determine whether counsel's performance was deficient before examining the prejudice

15  suffered by the defendant as the result of the alleged deficiencies. *Id.* at 697; *Williams v. Calderon*,

16  52 F.3d 1465, 1470 & n.3 (9th Cir. 1995) (applauding district court's refusal to consider whether

17  counsel's conduct was deficient after determining that petitioner could not establish prejudice),

18  *cert. denied*, 516 U.S. 1124 (1996).

19        The *Strickland* framework for analyzing ineffective assistance of counsel claims is

20  considered to be "clearly established Federal law, as determined by the Supreme Court of the

21  United States" for the purposes of 28 U.S.C. § 2254(d) analysis. *See Cullen v. Pinholster*, 563

22  U.S. 170, 181 (2011). A "doubly" deferential judicial review is appropriate in analyzing

23  ineffective assistance of counsel claims under § 2254. *See id.* at 200-202; *Harrington v. Richter*,

24  562 U.S. 86, 105 (2011) (same). The general rule of *Strickland*, i.e., to review a defense counsel's

25  effectiveness with great deference, gives the state courts greater leeway in reasonably applying

United States District Court
Northern District of California

29

United States District Court
Northern District of California

that rule, which in turn "translates to a narrower range of decisions that are objectively unreasonable under AEDPA." *Cheney v. Washington*, 614 F.3d 987, 995 (9th Cir. 2010) (citing *Yarborough v. Alvarado*, 541 U.S. 652, 664 (2004)). When § 2254(d) applies, "the question is not whether counsel's actions were reasonable. The question is whether there is any reasonable argument that counsel satisfied *Strickland*'s deferential standard." *Harrington*, 562 U.S. at 105.

As to Claims 1-5, the California Court of Appeal expressly found that the conduct complained of was "harmless":

> The jury was instructed that it "must not be biased against [a] defendant just because he has been arrested, charged with a crime, or brought to trial," and that "[a] defendant has an absolute constitutional right not to testify." Indeed, the jury was specifically warned not to "consider, for any reason at all, the fact that defendants Sims, Stills, and Davis did not testify." The jury was also instructed that it must follow the law as explained by the trial court, not counsel, and that counsel's remarks in closing arguments are not evidence. Sims does not challenge the correctness of these or any of the other instructions given, including those on what he characterizes as "[t]he only real questions before the jury"—whether he fired in defense of himself or Ambrose and whether he proximately caused Pierce's death. Thus, even if the jury might have perceived the prosecutor's comments about Reed and Ward as an invitation to convict Sims on an improper basis, the instructions adequately dispelled that risk. In sum, even if Sims's counsel's performance had been deficient, there is no "reasonable probability that ... the outcome of the proceeding would have been different" had counsel objected to the challenged remarks. (*Mai*, *supra*, 57 Cal.4th at p. 1009.)

*Sims*, 2020 WL 3780057, at *12. Because the alleged misconduct was harmless, and there is no reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different, Sims's ineffective assistance claims fails as to the conduct alleged in Claims 1-5. *Strickland v. Washington*, 466 U.S. at 694.

As to Claims 6 and 7, as explained above the Court agrees with the California Court of Appeal that the prosecutor did not engage in misconduct. The prosecutor neither misled the jury as to the burden of proof, as alleged in Claim 6, nor posed a hypothetical with the sole and improper aim of playing upon the jury's emotions, as alleged in Claim 7. Because there was no misconduct,

1    Sims's counsel was not ineffective for failing to make a meritless objection. *See Juan H. v. Allen*,

2    408 F.3d 1262, 1273 (9th Cir. 2005).

3         Because Sims fails to show he was prejudiced by counsel's failure to object to the alleged

4    misconduct identified in Claims 1-5, and because any objection to the conduct identified in Claims

5    6 and 7 would have been meritless, Sims is not entitled to relief on Claim 8.

6         **F.    Claim 9: Cumulative Error**

7         In Claim 9, Sims argues the cumulative effect of the alleged constitutional errors violated

8    his right to a fair trial. In some cases, although no single trial error is sufficiently prejudicial to

9    warrant reversal, the cumulative effect of several errors may still prejudice a defendant so much

10   that his conviction must be overturned. *Alcala v. Woodford*, 334 F.3d 862, 893–95 (9th Cir. 2003).

11   However, where there is no single constitutional error existing, nothing can accumulate to the

12   level of a constitutional violation. *Hayes v. Ayers*, 632 F.3d 500, 524 (9th Cir. 2011). Similarly,

13   there can be no cumulative error if there has not been more than one error. *United States v.*

14   *Solorio*, 669 F.3d 943, 956 (9th Cir. 2012).

15        Here, there were no constitutional errors and, therefore, nothing can accumulate to the

16   level of a constitutional violation. Sims therefore is not entitled to relief on Claim 9.

17                          **IV. CONCLUSION**

18        After a careful review of the record and pertinent law, the Court concludes that the Petition

19   must be **DENIED**.

20        Further, a Certificate of Appealability is **DENIED**. *See* Rule 11(a) of the Rules Governing

21   Section 2254 Cases. Petitioner has not made "a substantial showing of the denial of a

22   constitutional right." 28 U.S.C. § 2253(c)(2). Nor has Petitioner demonstrated that "reasonable

23   jurists would find the district court's assessment of the constitutional claims debatable or wrong."

24   *Slack v. McDaniel*, 529 U.S. 473, 484 (2000). Petitioner may not appeal the denial of a Certificate

24   of Appealability in this Court but may seek a certificate from the Court of Appeals under Rule 22

25

31

of the Federal Rules of Appellate Procedure. *See* Rule 11(a) of the Rules Governing Section 2254 Cases.

      The Clerk shall terminate any pending motions, enter judgment in favor of Respondent, and close the file.

      **IT IS SO ORDERED**.

Dated: April 17, 2023

BETH LABSON FREEMAN
United States District Judge